Your honors, Mr. Osterle, as the court knows this is a an appeal from an order from the district court Judge Layton for restitution in a case where our clients all pled guilty to harvesting trees illegally in the Olympic National Forest. Judge Layton awarded a sum of $336,478 as the restitution amount and he made it joint in several. The amount is broken down to the sum of an amount that was presented by the court, $1,000,022 for the actual value of the trees and the cost associated to the victim, the U.S. Forest Service because of their illegal harvesting, and then another $250,000 that the court assessed. Is it your view that the only value of the trees is what they had for selling the wood? Well, your honor, what we argued was that the method that was advanced by the government with regard to the cost over and above the cost, the value of the wood, was an inappropriate method. And what was your method of... We didn't offer a specific method to advance any particular amount of restitution other than, to a great extent, agreeing with the Penman report, which was the $86,000. Which is the value of the wood to sale if you chop it up, is that right? Correct, your honor. Is it fair market value? It's probably not fair market value, but it's close. What the court did is he made the amount of the value of the wood, deducted the amount that the government got on the salvage sale, and added back in costs that were approved by the government with respect to what it cost to actually run the site. So is it your view that no restitution can be had for other than pure provable economic value and nothing for historic or ecological or aesthetic or any other values, so that if someone burned down a famous old house, that you could rebuild a house for $200,000 and you could make it look like it was Lincoln's house? Your honor, that isn't specifically what we're arguing. What we have to argue here is that the MV, Mandatory Victims Restitution Act, requires that there be a specific articulable theory for any part of a restitution. Well, what I'm asking you is whether the specific articulable theory that there are values beyond pure monetary, in other words, if you have a client who, you know, you're the plaintiff's lawyer, it's so many dollars for their broken leg and so many dollars for pain and suffering, and those are actual, measurable, compensable damages. Why would it be any different in this kind of situation? Why wouldn't there be some component beyond just the pure financial? The government was free to argue that, and of course it did, to the best of its ability. But the issue of ecological value, we argue, is not a theory. It's a concept. It's a concept that... What's the difference between a theory and a concept? That escapes me. A theory, the concept would be there should be some component, some ecological or non, I guess, dollars and cents component with regard to market value above that dollars and cents market value component. A theory would be how to calculate that. Let me, if I... Well, there was an expert witness here other than the one that you liked, right? Well, there was. It was Dr. Jan Henderson. Actually, of course, the government expounded two theories, the Penman theory, which was, in essence, the market value theory and the ecological component. But we're looking at what the district court did, not what the government's theories were. So what's specific? Given the fact that one of the experts gave a figure that was closer to a million dollars, what exactly did the district court do wrong when it selected some value but much lower than what the expert provided for? Well, I think it's quite specifically stated in our briefs, but this is how the district court erred. The district court rejected the theory that the government proposed, the trunk theory of calculating the value of the timber. The fact that the court decided and stated that the trunk theory was not an appropriate theory is in the record many times. Then the court went ahead and found a value. The problem is that the court never articulated how he got to that value except for a very vague explanation, which indicated that it was analogous to a pain and suffering award in a personal injury matter. But there was no way that we could tell how that got to be calculated, and there was no articulation as to how that would be. How do you articulate when you're talking about pain and suffering? Well, pain and suffering is actual pain, and suffering is non-physical pain, but still a detriment based on the... And what? Then you say, well, this lady over here has actual pain. How do you decide how much she's entitled to that while sitting and listening to you instead of speaking yourself? How do you give her dollars and cents for that pain? You're making my argument, Your Honor. No, I'm saying to you this is just like pain and suffering. How do you get to it? But you can't pull that out of thin air, and that's what the Allen case says. How much does she get for this time that she's in pain? I don't know, Your Honor. See, I can't figure that out, and that was the problem that we had. But if you had an expert who could, why couldn't the jury or the court or whoever is making a decision rely on that, which is essentially what happened here? Absolutely, Your Honor, but we didn't have an expert that the judge could rely on because the expert that discussed this was an expert that used a theory that the court rejected and that our experts amplified that was absolutely inappropriate to trees growing in the wild. So the only theory that the government expounded with regard to that was a theory that not only was inappropriate, but the judge agreed was inappropriate. So in theory, the court, I suppose the government could have presented some unknown expert that might have had a theory with regard to ecological value that might have made sense under the Act and might have been a basis under the preponderance of the evidence for the court to rule with respect to that. What's our standard of review? The standard of review, Your Honor, is de nobis. On the amount of restitution? Well, I think the standard of review is de nobis because I thought it was abusive discretion. I did, too. Well, I think it's de nobis because the court is – we're arguing that the court needs to look at the method that Well, if your argument is that ecological value is not compensable as a matter of restitution, that may be a legal question. Well, the – Is that your argument? Is it just ecological value? You can't – it's not covered by restitution? No. That's not my argument. The argument is – and that's why – that was my argument that the ecological value is a concept, but there was no method used in order to argue and to present evidence as to how that ecological value could be quantified. And that's what we're saying. And that is why we argue that it's de novo because there was no method presented. So is your argument that if the district court would have bought – if it would have said clearly, you know, I find that the government's argument, the evidence presented by the government's expert is sound and convincing and restitution is $1 million. Yes. Then you wouldn't be here today. No, that's not true, Your Honor. We could have argued the same thing. We could have argued that the court should look de novo at that method, but at least there would have been a method, which there wasn't in this case. And I am now out of time. Thank you. Thank you. Good afternoon, Your Honor, counsel. First of all, I appreciate the opportunity to just be able to address a very narrow question in the context of our entire argument, and that was Judge Layton's decision not to apportion or award Mr. Stutzman less restitution than the other individuals. The court made the restitution figure joint and several with all the defendants. Is this not a matter of discretion under the statute? It says that the court may, in quotes, order joint liability if the given defendant contributed to the loss. Certainly, Your Honor, and we believe that it is an abuse of discretion standard, and we believe that Judge Layton abused his discretion by not considering Mr. Stutzman's discretion as a proportional liability because of that. But the whole point of having discretion to order joint liability would suggest that it isn't per se an abuse of discretion, it seems, as long as the person contributed to the loss, which your client clearly did. Clearly, Your Honor. Are you saying he clearly contributed to all the loss, to all 14 of the trees? No, Your Honor. The evidence was clear that he only cut down one tree and was involved in the conspiracy for only one month. And then he disassociated himself. Well, then your answer to Judge Gravey should have been the opposite, I would assume. You're saying your position is he didn't contribute to 13 fourteenths of the loss. Right. I'm sorry if I didn't make that clear. Yes, I meant to say that he only he didn't contribute to all of them, and Judge Layton abused his discretion by not, at the hearing, not taking that into consideration. I thought he was involved in some of the clearing of the. . . That, you know, if you look at the pictures the government submitted, there's a long forest road, and he cleared the way to one of the sites. But after he left, several other trees were cut down that were not at that exact location. So clearly additional work had to be done.  Eight trees that were cut down total. There were five dead trees there, I think. I'm pretty sure on that. So, you know, although he cleared some of the way, additional work was needed for the work to continue. The government also made the point that he had somehow used a permit at one of the mills. And, in fact, there were other mills used by the defendants after Mr. Stutzman left the conspiracy. Well, the mill that he used, was that in connection with the tree that he helped cut down at the beginning? Yes, the tree that he cut down only. So I'm also out of time. Thank you. May it please the Court, Counsel. My name is Jim Osterly. I represent the government in this case. The standard of review is critical as this Court reviews the District Court's determination in this case. The question or the issue before the Court is, did the District Court commit clear error in awarding the Forest Service the amount of approximately $336,000, or that figure falls within the range or realm of permissible computations, given the evidence presented to the Court, even if this Court were to have found differently had it been sitting as the trier of fact. As this Court is aware from the Gordon case, the primary and overarching purpose of the Mandatory Victim Restitution Act is to compensate victims, to fully compensate them, and to restore them to their original state of well-being. In this case, the defendants contributed, conspired, to cut down 13 old-growth western red cedar trees, many of which were several hundred years old. I'm a little bit troubled by the vagueness of how one measures that. To go back to my earlier example, if someone were criminally responsible for breaking somebody's legs, running them over with a car, and they had $80,000 in doctor bills, wouldn't that be the measure of restitution as distinct from other kinds of punishment or civil liability, if that's all of their out-of-pocket losses? Medical bills or lost wages or whatever, but it would not normally include intangibles. I think the Court's earlier reference to pain and suffering is appropriate, and it's a reference the District Court made in this case. Is that recoverable in a personal injury restitution context, such as an assault? I believe pain and suffering is if it's restitution. I believe the statute allows for that recovery. Normally, the measure is fair market value, and the judge noted that in some cases there is no fair market value, and this is one such case. There was no market for this. But on what basis did the judge arrive at this figure? The $336,000? Yeah. He assessed the information before him from the government, which was Dr. Henderson's trunk formula method. And he rejected that, right? He rejected the methodology, which is reviewed for clear error. He rejected the process Dr. Henderson used to arrive at that figure. He did not reject the concept that replacement value is appropriate where there's no fair market. And in lieu of a fair market, he arrived at a number that fit within the realm of possible computations, the $86,000, which he assessed to be the floor, the ceiling he assessed to be the $913,000 that Dr. Henderson submitted was an accurate replacement value. Anywhere within that scope or that realm of possibilities is appropriate for the district court to arrive at. So how did he arrive at $250,000 as a replacement value for the? It is not clear from his decision. Well, you were there. What's your best assessment of what he did? He ascribed some multiplier, I believe, to the fair market value. And where did he get that multiplier? In his words and his infinite wisdom. And I understand. Well, that's not a bad standard for a district judge. Could that be a rule of thumb that we should write for restitution orders for district judges? No, I don't believe so, Your Honor. And we initially considered a cross appeal in this case to get us back the $913,000. And the decision was made that the number he arrived at was not clearly erroneous. It fell within the realm of permissible computations. Well, is that the only standard? It seems to me if let's say the question is purely fair market value, but there's no intangible or aesthetic or historic or any of those kinds of things, and you have one expert saying 900 and one saying 86, in that situation where it's clearly only financial, can the district court just say, I think I like 336 or I like 500 or I'll split the difference? Is that something we would approve of? I think what the court can do in this case is look at the testimony of Dr. Henderson. He provided a methodology. Now, while the methodology was rejected, he did testify to numbers. He testified to what a replacement tree would cost. He testified to certain intangibles or qualitative factors that he considered important in assessing what a tree is worth, an old-growth western red cedar tree is worth. So there was information before the court. Dr. Henderson testified at some length. The hearing lasted a day. Was his method the same as the Sixth Circuit approved in the Johnson case? It was the same method used. And even the Sixth Circuit elected to discount. It accepted the method but discounted how it was to be applied in that particular case. And certainly, while there's not specific words in the record, you could view the district court's decision in this case as essentially discounting off of that figure. It accepted that there was a value higher than fair market value. And it's just what was that value. It discounted Trump formula method. But it applied a number that, again, fit within that range of what was acceptable, which fits within, again, the primary and overarching purpose of the statute, which is to compensate victims for their loss. Compensation based on fair market value would not be appropriate in this case. Was there a fine asked for in this case? No, there was not. Why wasn't there? I feel like this could have been handled through a fine as well. Well, the determination was made that the appellants lacked financial resources sufficient to pay both a fine and restitution. So the district court determined that. Well, you could have had a fine for a greater amount and only asked for the fair market value. And there's some question as, you know, once the fine comes in, there's no means, of course, of appropriating it out to the victim. This money is going to the United States, right? Correct. But the restitution would go to the Forest Service as a means of compensating them for their loss, which in this case was significant. Well, couldn't the United States have given it to the Forest Service? It could have, as an administrative matter. Congress, in its infinite wisdom, could have given it to the Forest Service, right? You know, I had that argument last week. The Forest Service was saying, well, we get the money, so we have to get it because Congress won't give it to us. So we get it from the forest, the people who cut the trees down. I found it odd then and odd here. I thought the Forest Service is part of the United States, isn't it? They no doubt are, Your Honor. But in terms of the Mandatory Victim Restitution Act, I don't think it would be met in this purpose, the purpose of which is to compensate victims. The victim here happens to be the United States, but as a victim they've lost something, something to which the act allows them to recover for. And the question, I guess, is what is that number? The court felt uncomfortable arresting Solan for a market value. The court, in fact, held there is a higher value here. Even the appellant's own expert said there is a higher value here, but I don't know what it is. It's a difficult problem, but I don't think the difficulty should cause us to step back and say you're not entitled to anything. Did the district say that the Trump method, he didn't like the method, but he got testimony that it was $913,000 roughly. That's right. Did he accept that as a figure? He would accept as a possible figure, but that he would evaluate it something less than that, or did he say that's not a proper figure? He said the method is not appropriate. The means by which you reach that number is not something he was willing to accept. So it's not as if he accepted that but said it's too much and went down. He didn't accept it? He didn't accept the method. What he did say was that is a large number, and the appellant's own expert said I don't know what it is, but that's a lot of money, what the government's asking for. So everyone seemed to agree that there is some value here. It's how to reach it. And again, under the clear air standard, you only need to find that it fell within the range of permissible computations given the evidence, and the evidence was extensive. There was value here. It's just what was that value? Before you run out of time, would you respond to the argument that Mr. Stutzman should not be jointly liable for the entirety? Mr. Stutzman pled guilty to a conspiracy count. That conspiracy was to remove these trees and sell them. Counsel is correct. He was a member of that conspiracy for about a month. Then he withdrew from that conspiracy. But his role during that month was critical. He assisted another one of his co-conspirators in clearing access to the site, access that facilitated the removal of all 13 trees, not just the one that he removed. And then he used his permit, a permit for land that he owned, to send that tree to a mill. Under state law, there's a permit required in order to take a tree to the mill for processing. So he used a permit to send one tree to the mill? When you say one tree, there were a couple of trips he took to the mill for that one tree. This was a very large tree. But there were 13 trees. That's correct. His permit was not used for all of them. So why isn't it enough for him to pay for the one tree out of the 13? Well, in addition to the first argument I made, which is access to the site, which is critical, the second is access as well, access to the mill. The mill was given a permit. The mill was put in a position of saying, okay, the timber this guy is bringing us is illegitimate. He's got a permit. But he only brought them the one tree. The one tree. But the mill then, and counsel again is correct, there were at least two mills used. That mill accepted subsequent trees under a false permit. In other words, the mill was put in a position of accepting these on the basis of those false permits. You're saying that the permit that he got for his one tree was applied to the other trees as well? Not all of them. No, there was a subsequent false permit used as well by his co-conspirators. I had one question about that because in the pre-sentence report on his offense conduct, it states that he provided mill operators with state-issued, specialized forest products harvesting permits in the plural. And so did he supply more than one permit, or is that a stray? No, he provided the same permit on more than one occasion. Okay, so that's why they used the plural, you think. I can't speak for the author of the report, but the facts are that he provided that permit on more than one occasion. Now, when he cleared this road, was that necessary to get the one tree, or was it more than was necessary for the one tree that they then used for the other trees? Factually, there was a main trunk road that had to be cleared, and then there were spurs off of the main trunk road. So you could argue that it was necessary for all of them, although the spur road that went to the tree he removed was unique to that tree, but the main trunk road, which he also assisted on, helped with accessing the other trees. But he would have had to do that in order to get the one tree. Correct. I had one more question back on an earlier topic, and that is how this number was derived at, and it relates a little bit to Judge Pius' question. The maximum statutory fine is $250,000, and that's the amount that the court used, I think, if I'm remembering correctly. They did use that. As the amount of restitution. Do you have any reason to think that those two are related, that he was thinking of the maximum fine, or was he trying to assess value? I don't believe it was with respect to the fine because there's another exchange in the record between the district court, I believe, and myself, where the court suggested that he was limited by the maximum fine for restitution purposes. One response is the Alternative Fines Act provides for an award of a fine of twice the gain or loss arising from the conduct. So there is another avenue which the government could have sought a fine far in excess of the statutory amount, namely twice the gain or loss. To answer your question directly, there's no direct reference in the record to his use of the fine as a means of assessing the top. What troubles me about what he did here is the district court judge makes a statement. The ability to quantify its value, he says, so damage is real, the ability to quantify its value has not as yet, in my judgment, been developed, at least to a degree that I would feel comfortable adopting and endorsing a methodology in a circumstance such as this. So getting back to what you said earlier, it seems as though there really is no real solid legal foundation for the amount of $250,000 other than his infinite wisdom, and I don't know that that qualifies. The legal foundation replacement value is what he rested on. How he determined what that replacement value is was he picked a number within that range I've been speaking of. He did not say it's $250,000 because I adopt a certain methodology. He didn't articulate a methodology, but he did pick a number within what he had been given, which is the evidence of that range. Unless there are no further questions, the government would respectfully request that the district court's determination be affirmed, both with respect to the amount of restitution and the finding that it is joint in several. Thank you. Thank you, counsel. Your Honors, with respect to the question of replacement value, the court thought about replacement value. There was a Shugart case and the Simmons case, and those cases approved replacement value. But in both of those cases, that value was quite easy to ascertain. Replacement value was based on personal property with respect to Simmons and the value of the church, rebuilding a church, with respect to Shugart. So that was an ability. What would it take to get a, I don't know, a hundred-year-old? The old South Bay church in Boston, where they all assembled. You can't do that. That's the problem. That's the problem. Which is why you are not willing to say that there can be nothing above just the value of the wood. Well, what we're saying. Because in answer to my question earlier, you said, well, ecological value or aesthetic, et cetera, is somewhat recoverable if you can prove it. But what does it take to prove it? That is, see, the luxury that we have, Your Honors, we don't have the burden of proof, the government does. The court says, to my knowledge, I'm quoting, or to the best of the evidence here, no scientific consensus, no actual consensus, no consensus in any field has developed an acceptable and approved methodology for valuing these resources. That's what the court said before he's made his ruling. The court's ruling of the $250,000, if you take that and you don't use it and you use treble damages and you add it together, there's only a difference of $9,000. There's a difference of something like, well, it's between $9,000 and $10,000. Your Honor, you ask about a fine. I'll quote from the government's pre-sentence report for Mr. James. Mr. James lacks the necessary resources to pay both the criminal fine and the mandatory restitution obligations sought by the government. Consequently, the government will not oppose a request that the fine be waived, and that's at the government's sentencing memorandum, April 6, 2009, page 4. Throughout this case, there is a thread of emotion, a thread of maybe these defendants should be punished. Well, didn't the district judge say, I'm not doing this for punitive purposes, I want to make it clear that it's not punitive? I think the judge probably said that, but he said lots of other things that were consistent with his feeling very angry at these gentlemen, which I don't blame him for. But that's a different question as to whether he can find a way to make restitution in a way that's not proved, that does not have a theory, and that was not sustained by appropriate evidence. Well, part of the question I have is, did he say, you know, one way to look at this is that it would be almost a million dollars. I think that's too much, and I don't think that's the right way to do it. So I think we ought to have a more reasonable amount, and I don't think the $85,000 in itself is reasonable. Somewhere in between when you're talking about something that's wholly intangible seems to be what we should find is reasonable, and I wouldn't say infinite wisdom, but whatever kind of brain power the district judge may have. To say that somewhere in that range, this is what seems fair to me. And that may seem fair, Your Honor, and I can't disagree with that sentiment, and that sentiment was very, very clear during this hearing. But even given that, the court concedes that he doesn't have a methodology. The court concedes he's very unsure as to what to do about this. What he says encapsulated and paraphrases, I really don't have any way of figuring this out quantitatively, but I think it should be more than the $86,000, and now I think it should be $250,000. Isn't that pretty much what a jury does with his pain and suffering? That's what the judge said. I'm approaching this problem much the way a juror would assess a damage component on a general damage item that's imponderable. What is a lifetime of pain worth if you had a bad back or a misdiagnosis or something like that? The fact that there's no methodology to follow that derives a number does not mean that the victim or plaintiff takes nothing for the real damage. And I'm way over my time, but the difference between what the jury would do in a personal injury case or another case where, say, civil punitive damage like treble damages would be authorized is that this case was under the Mandatory Victim Restitution Act, which is specific by its terms and by the cases interpreting it that there must be specific and basically understandable, reproducible evidence to find the parts of this matter that should be restitution and the amounts. And so that's how it differs from a civil personal injury case and how it differs from an award of pain and suffering. And that's why we don't agree that the court can use that. And finally, even if the court did use that, he didn't articulate how he came to that $250,000. He didn't do what has been mentioned here saying 915 is too much, 86 is too low. He didn't say that. No, he said this is his estimate, his best estimate of the actual value of ecological harm. That's what he said, Your Honor. And then it was a subjective, speculative decision on his part and therefore not sustainable. You see, I understand it's not your burden to tell us how you would calculate this. And I understand why you probably don't want to advance a theory or whatever. I've forgotten what your two things are. One's a theory, one's a concept. But I don't think we should be left with the idea that, yes, there is damage, which I don't think you deny that there's ecological damage, and that there's no way to measure it. Would you have been satisfied if an expert had come in and said, you know, to me the historic value of this is $562,000? Then you would have said, well, where did he get that idea, $562,000? Exactly, Your Honor. And if that unknown but theoretical expert had come in, we would have listened to what he said. We would have cross-examined him. We would have argued it. And perhaps that expert's theory would have been accepted by the court, and perhaps that theory would have made enough sense that it would be difficult to disagree with. And perhaps had that happened, we wouldn't have appealed. But that's not what happened. What happened is that there was no theory. Well, there were two theories at one end, a low theory and a high theory. Yes, Your Honor. But there was no theory for the middle ground, and there needs to be one. When you do have a theory, he doesn't have to accept the figure the expert gives. But he rejected the theory. He did reject the theory. Specifically and explicitly, he rejected the theory. And then he offered no substitute theory, and that's the problem that we see in this case. Okay, thank you. Thank you very much, Your Honor. Thank you all. The case is submitted.
judges: Reinhardt, Graber, Paez